# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ANDREW E. ROTH,

    Plaintiff,

v.                                     Case No. 6:23-cv-722-JA-RMN

AUSTIN RUSSELL,

    Defendant,

and LUMINAR TECHNOLOGIES, INC.,

    Nominal Defendant.

___

## ORDER

This case is before the Court on Defendant Austin Russell's motion to dismiss the amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Doc. 39). Having considered the parties' submissions, the Court concludes that the motion must be granted.[1]

**I.    Facts**[2]

"At all relevant times," Russell was the Chairman of the Board of

---

[1] The parties requested, and were granted, oral argument on the motion. (*See* Docs. 46 & 53). However, after reviewing the parties' submissions, the Court finds that oral argument is unnecessary.

[2] The facts are from the amended complaint (Doc. 11) and are taken as true at this stage. *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019).

Directors, "President, Chief Executive Officer [(CEO),] and controlling stockholder" of Luminar Technologies, Inc. (Doc. 11 ¶ 11). On July 1, 2021, he sold 10,500,000 shares of common stock in Luminar for $21.00 per share. (*Id.* ¶ 9). In December 2021, Luminar repurchased 15,263,761 shares of common stock for, on average, $15.45 per share. (*Id.* ¶ 10). Based on a document that Russell filed with the Securities Exchange Commission (SEC) pursuant to 15 U.S.C. § 78m(d), he had an "approximate 28.3% indirect pecuniary interest" in the repurchases. (*Id.* ¶ 14).

If Russell's July 2021 sales are matched with Luminar's December 2021 repurchases, Russell "realized . . . profits of at least $23,974,026.21 that," allegedly, "are disgorgeable to" Luminar. (*Id.* ¶ 15). On February 13, 2023, Plaintiff Andrew E. Roth, a Luminar stockholder, demanded that Luminar sue Russell to recover these profits. (*Id.* ¶¶ 1, 21). But Luminar did not sue Russell. (*Id.* ¶ 21). Accordingly, on April 20, 2023, Roth sued Russell under 15 U.S.C. § 78p(b) on Luminar's behalf for Russell's profits. (Doc. 1 at 2, 5). On May 3, 2023, Roth amended his complaint to correct a misspelling in the case caption. (*Compare id.* at 1, *with* Doc. 11 at 1).

## II.   Rule 12(b)(6) Standard

In deciding motions to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), courts "accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Henley v. Payne*, 945

F.3d 1320, 1326 (11th Cir. 2019). For a pleading to state a claim for relief, it "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When complaints allege "violations of securities laws," courts may judicially notice "relevant SEC filings." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 631 n.5 (11th Cir. 2010).

## III.  Discussion

Under 15 U.S.C. § 78p(b), "any profit realized by" a director, officer, or principal stockholder (insider) of a company "from any purchase and sale, or any sale and purchase, of any equity security" of the company "within any period of less than six months . . . shall inure to and be recoverable by" the company, "irrespective of any intention on the part of [the insider] in entering into such transaction." *Id.* This statute serves to "prevent[] the unfair use of information

which may have been obtained by [the insider] by reason of his relationship to" the company. *Id.*; *accord Feder ex rel. Ivax Corp. v. Frost*, 220 F.3d 29, 36 (2d Cir. 2000) (noting that the statute "is a prophylactic measure designed to deter insider short-swing trading"). The statute acts as "a relatively arbitrary rule capable of easy administration" and "imposes strict liability." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972) (quoting *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970)).

To state a claim under 15 U.S.C. § 78p(b), a plaintiff must plead that "there was (1) a purchase and (2) a sale of securities (3) by an [insider] (4) within a six-month period." *Gwozdzinsky ex rel. Revco D.S., Inc. v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998); *see also Gund v. First Fla. Banks, Inc.*, 726 F.2d 682, 687 (11th Cir. 1984) ("[The director, who directly conducted the transactions,] has stipulated to every element of [15 U.S.C. § 78p(b)] liability. It is undisputed that the transactions were sales and purchases . . . of . . . equity securities and that he is an insider with respect to [the company that issued the securities]. The sales and purchases were never separated by more than one day and were sometimes simultaneous.").

Even when insiders do not purchase and sell their companies' stocks directly, they may be liable for indirect stock purchases and sales. *See* Arnold S. Jacobs, *Section 16 of the Securities Exchange Act* § 2:62 (West Feb. 2023) (accounting for the situation in which the insider directly sells shares and, less

4

than six months later, indirectly—through "another person or entity"—purchases shares). Purchases and sales conducted by insiders' close family members may be attributed to the insiders. *See* 17 C.F.R. § 240.16a-1(a)(2)(ii)(A) (creating a rebuttable presumption that transactions by "members of [an insider]'s immediate family sharing the same household" are attributable to the insider); *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 519, 523–24 (9th Cir. 1981) (attributing "transactions involving securities for [a] mother's account" to her adult son because through "a broad general power of attorney," he had "control over the securities" and the "unfettered ability to use the money for his own benefit"), *abrogated on other grounds by Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227–28 (2012); *Whiting v. Dow Chem. Co.*, 523 F.2d 680, 681–82 (2d Cir. 1975) (attributing sales conducted by an insider's spouse to the insider); *B.T. Babbitt, Inc. v. Lachner*, 332 F.2d 255, 257 (2d Cir. 1964) (accepting the parties' stipulation that a sale conducted by the insider's spouse was attributable to the insider); *Bershad*, 428 F.2d at 695–96 (affirming summary judgment against an insider and his spouse when each bought and sold shares of the company's stock). Purchases and sales conducted by insiders' agents and alter egos may also be attributed to the insiders. *See* 17 C.F.R. § 240.16a-1(a)(2)(ii)(B) (attributing to an insider a transaction by a general or limited partnership in which the insider is a general partner); *Blau v. Lehman*, 368 U.S. 403, 409–10 (1962) (recognizing that a business entity that acts

through another person can itself be an insider); *Feder*, 220 F.3d at 34 (attributing to an individual and a partnership wholly controlled by him sales conducted by a corporation of which he was a director and was, together with the partnership, a principal stockholder).

Roth plausibly alleges that Russell was a director, an officer, and a principal stockholder of Luminar and thus an insider three times over under 15 U.S.C. § 78p(b). (Doc. 11 ¶¶ 11, 14; Doc. 39 at 4; Doc. 41-3 at 1); *see* 15 U.S.C. § 78c(a)(7) (defining "director" as "any director of a corporation or any person performing similar functions with respect to any organization, whether incorporated or unincorporated"); 17 C.F.R. § 240.16a-1(f) (defining "officer" to include the president of the company issuing the stock); 17 C.F.R. § 240.16a-1(a)(1) (defining a principal stockholder, or "a beneficial owner of more than ten percent of any class of equity securities" in the company, as "any person who is deemed a beneficial owner pursuant to [15 U.S.C. § 78m(d)] and the rules thereunder," subject to exceptions). Roth further alleges that Russell directly sold Luminar stock on July 1, 2021, and indirectly bought Luminar stock through Luminar's December 2021 repurchases of its own stock. (Doc. 11 ¶¶ 9–11). If Luminar's repurchases are attributable to Russell, then "there was (1) a purchase and (2) a sale of securities (3) by an [insider] (4) within a six-month period." *Gwozdzinsky*, 156 F.3d at 308. If they are not, then the amended complaint fails to state a claim under 15 U.S.C. § 78p(b) because it alleges no

other purchase by Russell occurring within six months of his July 1, 2021 sale. (*See* Doc. 11).

Russell contends that Luminar's repurchases are not attributable to him for three reasons. (*See* Doc. 39 at 7–11).[3] First, Russell argues that the "plain language" of 15 U.S.C. § 78p(b) "distinguishes between the corporate insider who can be liable under the statute" and the company issuing the stock, which cannot be liable, and that the statute "predicates liability on trades" conducted by the insiders, not the company. (Doc. 39 at 8, 11). Second, says Russell, the repurchases cannot be attributed to him because Luminar conducted them "at the direction of its majority independent board of directors," and holding him liable for such an "involuntary" transaction would "plainly violate" the statute's intent by "creat[ing] liability . . . where there was no potential . . . to abuse insider information." (*Id.* at 8–11). And third, Russell asserts that Roth's theory of liability "would cause every insider, regardless of their level of stock ownership, who sold stock in the months before a corporate repurchase to become retroactively liable under" the statute—an outcome that "would be absurd, unfair to investors," and contrary to the statute's intent. (*Id.* at 11

---

[3] Russell also argues that the amended complaint fails to state a claim under 15 U.S.C. § 78p(b) because it does not allege that he made any profit from the sale and purchase of the Luminar stock. (Doc. 39 at 12–15). However, according to the amended complaint, "Russell realized short-swing profits of at least $23,974,026.21" through the July and December 2021 transactions. (Doc. 11 ¶ 15). The Court accepts this allegation as true at the motion-to-dismiss stage. *See Henley*, 945 F.3d at 1326.

7

(emphasis omitted)).

Roth does not address Russell's third argument but responds to the other two. (*See* Doc. 47). As to the first argument, Roth contends that by the "plain and unambiguous language" of 17 C.F.R. § 240.16a-1(a)(2), Russell has "beneficial ownership" of Luminar's repurchases through his "indirect pecuniary interest" in them. (Doc. 47 at 10–13). As to the second argument, Roth maintains that because Russell was Luminar's "controlling shareholder, CEO, and Chairman of the Board," the repurchases were conducted with his approval; that the repurchases were voluntary; and that in any event, Russell's "affirmative defense that he did not have control over the . . . repurchases . . . is not properly determined" on a motion to dismiss for failure to state a claim. (*Id.* at 14–15 & n.7). Roth adds that "[a]s a controlling shareholder, Russell had an obvious opportunity to profit from the use of inside information through his ownership interest in [Luminar]'s repurchases" and that "such potential abuse of inside information is exactly the kind of conduct that the statute was designed to prevent." (*Id.* at 2).

This case presents the extraordinary situation in which the 15 U.S.C. § 78p(b) plaintiff, on behalf of the company that issued the equity security, seeks to attribute to the insider a transaction conducted by that very company. The Court could find no other cases presenting that situation.

In the more common situation in which the plaintiff seeks to attribute to

the insider a transaction conducted by a different company, persuasive authority supports that courts should determine whether the insider "was a beneficial owner of the . . . stock sold" or purchased by that company by referring to the SEC's definition of "beneficial owner." *Feder*, 220 F.3d at 34; *see* 17 C.F.R. § 240.16a-1(a)(2) (defining "beneficial owner" for 15 U.S.C. § 78p(b) purposes as "any person who, directly or indirectly, . . . has or shares a direct or indirect pecuniary interest in the equity securities," subject to exceptions, and defining "pecuniary interest in any class of equity securities" as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities"). This definition is intentionally broad: at its most sweeping, it makes a securities transaction attributable to an insider whenever the insider indirectly shares an indirect opportunity to share in any profit from the transaction. 17 C.F.R. § 240.16a-1(a)(2).

As a result, Roth's theory of liability proves too much. Simply by virtue of being an insider of the company that issues the security, the 15 U.S.C. § 78p(b) defendant will almost always be a beneficial owner of the stock sold and purchased by that company because directors, officers, and principal stockholders almost always at least indirectly share indirect opportunities to share in the profits from such transactions. Under Roth's theory, then, every time a company that issues an equity security conducts a sale or purchase in that security, every insider in that company is deemed to conduct the

transaction himself under 15 U.S.C. § 78p(b). The statute does not say as much, and if Congress wanted to make every security transaction conducted by a company attributable to its insiders under 15 U.S.C. § 78p(b), it could have done so in plain terms. *See United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) ("[W]e must presume that Congress said what it meant and meant what it said."). Instead, the statute uses the term "issuer" to refer to the company issuing the security and the phrase "such beneficial owner, director, or officer" to refer to the insider liable for "any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer." 15 U.S.C. § 78p(b). "We generally seek to respect Congress'[s] decision to use different terms to describe different categories of people or things." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012). And the statute establishes that the issuer and the insider are different persons when it states its purpose: "preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." *Id.* It does not make sense to think of the insider as obtaining information "by reason of his relationship to" himself; rather, the relationship with which the statute is concerned is that between the insider and the company of which he is a director, officer, or principal stockholder.

Russell's argument that Roth's theory of liability "would cause every insider . . . who sold stock in the months before a corporate repurchase to

become retroactively liable under" the statute also has merit. (Doc. 39 at 11 (emphasis omitted)). Roth has no answer for this argument. (*See* Doc. 47). And the Court agrees that under Roth's theory, insiders who sold their company's stock for themselves less than six months before the company repurchased its own stock would be strictly liable for any profits they made from the pair of transactions, unless an exception applied. *See* 15 U.S.C. § 78p(b); *Reliance Elec.*, 404 U.S. at 422. This outcome seems unfair and likely to interfere with not only the insiders' but also their company's plans to buy and sell the company's stock. *See In re Chapman*, 166 U.S. 661, 667 (1897) (encouraging courts to construe statutes, "if possible, so as to avoid an unjust or an absurd conclusion").

Roth relies heavily on the SEC's amicus brief in *Feder* to support his position. (*See* Doc. 47 at 2–4, 9–15). But *Feder* did not involve, and the SEC did not address in its brief, the extraordinary situation that this case presents. *See Feder*, 220 F.3d 29; (Doc. 49-10). In fact, the SEC seems not to be operating in accordance with Roth's theory. The SEC recently updated its disclosure requirements related to issuer repurchase programs. *See* Share Repurchase Disclosure Modernization, 88 Fed. Reg. 36002 (June 1, 2023) (codified at 17 C.F.R. pts. 229, 232, 240, 249, 274). In its report about the amendments to the disclosure regulations, the SEC did not refer directly to 15 U.S.C. § 78p(b) at all, though it did directly mention related subsection 15 U.S.C. § 78p(a) eight times. *See* Share Repurchase Disclosure Modernization, 88 Fed. Reg. 36002. In the

report, the SEC discussed comments "ask[ing] [it] to prohibit corporate insider trading before, during, and after buyback announcements and execution." *Id.* at 36021. It noted numerous studies about the relationship between insider share transactions and announcements and executions of corporate share repurchases, *id.* at 36033–35, including "a recent study" about "actual share repurchases . . . that occur prior to insider sales," *id.* at 36034 n.421. And it amended the disclosure regulations to require issuers to report "[a]ny policies and procedures relating to purchases and sales of the issuer's securities during a repurchase program by the officers and directors, including any restriction on such transactions." *Id.* at 36053. If the SEC viewed issuer repurchases as insider purchases for 15 U.S.C. § 78p(b) purposes, surely it would have referred to 15 U.S.C. § 78p(b) somewhere in its comprehensive report. Under Roth's theory, 15 U.S.C. § 78p(b) prohibits insiders from buying or selling issuer shares within six months of the issuer's repurchase of its own stock, and this prohibition would directly relate to the topics discussed in the report. The absence of any mention of 15 U.S.C. § 78p(b) from the report suggests that the SEC does not endorse Roth's theory.

The parties' submissions make clear that Roth's theory depends on attributing Luminar's repurchases to Russell. (*See, e.g.*, Doc. 39 at 7–8 ("The [amended c]omplaint does not, and cannot, allege that . . . Russell made a matching sale and purchase of Luminar stock within a six-month period.

12

Instead, [Roth] argues that Luminar's December 2021 stock repurchases can be attributed to . . . Russell as a controlling stockholder." (emphasis omitted)), 15 (arguing that the amended complaint's dismissal should be with prejudice because further amendment would be futile); Doc. 47 at 6–7 (discussing only the July 1, 2021 sale and December 2021 repurchases as "Russell's [s]hort-[s]wing [t]ransactions" (emphasis omitted))). Roth does not seek leave to amend. (*See* Doc. 47). And "[a] district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc). Accordingly, because Luminar's repurchases cannot be attributed to Russell, the amended complaint will be dismissed with prejudice.

## IV. Conclusion

Accordingly, it is **ORDERED** that Russell's motion to dismiss (Doc. 39) is **GRANTED**. The amended complaint (Doc. 11) is **DISMISSED with prejudice**. The oral argument set for November 14, 2023, is **CANCELLED**. This case is dismissed, and the Clerk is **DIRECTED** to close this case.

**DONE** and **ORDERED** in Orlando, Florida, on October 17, 2023.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record